UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDN
D CUMENT
EL CTRONICALLY FILED
DOC #: _____
DATE FILED: _____
```

---

IVA SUNEGOVA,

                              Plaintiff,

        -against-

THE VILLAGE OF RYE BROOK, THE VILLAGE
OF RYE BROOK POLICE DEPARTMENT, SGT. S.
WILSON, DET. S. GORALICK, THE CITY OF RYE
POLICE DEPARTMENT,

                              Defendants.

---

Case No. 09-CV-4956 (KMK)

ORDER

KENNETH M. KARAS, District Judge:

        Iva Sunegova ("Plaintiff") filed a Complaint, pro se, on May 27, 2009, claiming, inter

alia, that she had been falsely arrested for prostitution, and falsely imprisoned as a result.  The

Court referred the case to Magistrate Judge Lisa M. Smith for General Pre-Trial Supervision.

(Dkt. No. 7.)  After repeated problems during discovery, Magistrate Judge Smith issued a Report

and Recommendation ("R & R"), concluding that the case should be dismissed with prejudice, or

that alternative sanctions should be imposed.  (Dkt. No. 88.)

        Plaintiff has objected to the R & R.  (Dkt. No. 93.)  For the reasons explained herein, the

R & R is adopted in part.

## I. Background

        Although the Court assumes the Parties' general familiarity with the factual and

procedural background of this case, as set forth in the thorough and thoughtful R & R and other

orders,[1] the Court will briefly summarize the facts most salient to the R & R.

        A. Inappropriate Communications

        Plaintiff's communications with defense counsel and Magistrate Judge Smith have been numerous and routinely inappropriate. For example, in emails to counsel for the City of Rye, Plaintiff has variously called him a "backstabbing soulless human," a "capitalistic pig[]," an "asskisser for authority," and a "puppet to capitalistic system." (Letter from Joseph Maria, Esq. to Mag. Judge Smith (Dec. 9, 2010) (Dkt. No. 55).) In these emails, Plaintiff also referred to American lawyers collectively as having "no balls" and as being "pussies." (*Id.*) At a conference before Magistrate Judge Smith on January 21, 2011, defense counsel informed Magistrate Judge Smith that they had received additional emails from Plaintiff along the same lines. (Order of Feb. 17, 2011 ("Feb. 17 Order") 31.) On February 17, 2011, Magistrate Judge Smith issued an order ("February 17 Order") warning Plaintiff that if she continued to engage in inappropriate communications, "the Court [would] be forced to consider whether additional sanctions should be imposed." (*Id.* at 3.)

        After the February 17 Order, Plaintiff continued to send inappropriate emails to defense counsel, which included lines like: "I never shoot to kill/ I only shoot to win/ I line up all the lawyers and watch them fall . . . My brain is the killer I be the winner"; "I line you up and watch you all fall . . . I am the best/ my sex is the winner! Even you corrupt judge wont [sic] help you anymore!"; "pussies with no balls, big mouth, no action"; and "Stop abusing me unproffesional [sic], uncivilized, disrespectfull [sic], emotionally returded [sic] pigs." (Order of Mar. 25, 2011

_____

[1] Namely, Magistrate Judge Smith's February 17, 2011 and March 25, 2011 Orders. (Dkt. Nos. 38, 71.)

("March 25 Order") 2-3.)  Counsel for the City of Rye also asserted that Plaintiff left him voicemail messages in which "she called him names and was quite disrespectful."  (*Id.* at 3 n.1.)

Magistrate Judge Smith issued another order on March 25, 2011 ("the March 25 Order"), "[i]n an attempt to stem this barrage of inappropriate communications." (*Id.* at 7.)  Magistrate Judge Smith initially considered barring Plaintiff from communicating with the court and defense counsel by any means except letters, but modified that to permit Plaintiff to send faxes, in consideration of Plaintiff's financial condition.  (*Id.* at 4, 7-8.)  The March 25 Order also directed Plaintiff to send any communication to both defense counsel and the court, and prohibited her from using "crude and abusive language," including but not limited to "words or phrases that are in any way similar in content or intention to these words: 'pussy' 'balls' 'psycho' 'retarded' 'pigs' 'bullet' 'kill' and 'killer.'" (*Id.* at 8.)  Plaintiff was warned that if she persisted in her inappropriate communications she would be issued a monetary sanction, and if she further persisted Magistrate Judge Smith would recommend dismissing her case in its entirety.  (*Id.* at 8-9.)

Despite this Order, Plaintiff continued to send emails to defense counsel without copying Magistrate Judge Smith, many of which used abusive language and several of which used the specifically prohibited words. For example, on April 4, 2011 Plaintiff sent an email to counsel for the Village of Rye Brook Defendants, stating, inter alia: "[Counsel] is treating me like I am some kind of **pig** with 0 respect and dignity. . . . I will not be treated like a **pig** and I will not be abused and I will not be taken advantage of again." (R & R 10-11 (emphasis added).)  On April 5, 2011 Plaintiff sent counsel a one sentence email: "stupid abusive and lying jerk [Counsel]." (*Id.* at 11.)  On April 20, 2011 Plaintiff sent counsel two emails, one of which included the word "bulletproof." (*Id.* at 11-12.)  Plaintiff sent defense counsel further emails on April 6, 11, 12, 13,

3

17, and 22. (Letter from Caroline Lineen, Esq. to Mag. Judge Smith (Dkt. No. 98).) She also

sent Magistrate Judge Smith several shockingly inappropriate letters, including one on April 4,

2011 that began "you truly are [sic] disgusting human being." (Letter from Pl. to Mag. Judge

Smith (Apr. 4, 2011) (Dkt. No. 96).)

Plaintiff was again warned about the consequences for these violations in Magistrate

Judge Smith's April 2011 R & R, and has nevertheless persisted in violating the March 25 Order.

In a May 3, 2011 letter to this Court, for example, Plaintiff claimed that Magistrate Judge Smith

and defense counsel were working against her, and that she had "done excellent job to kill all 5

brains with only one brain to my side." (Letter from Pl. to Ct. (May 3, 2011) (Dkt. No. 92).) On

May 7, 2011 Plaintiff sent a letter to "Dishonorable" Judge Smith, stating:

> "You so remind me Hillary Clinton with pretending that she is seeing killing of
> Osama Bin Laden, while there is no [sic] any Osama Bin Laden to be watched.
> You are like her, lying for the money. At least she is getting paid [sic] little more
> for it then [sic] you. In the future I would start to increase you [sic] bribe amount
> since it might cost you your job very soon."

(Letter from Pl. to Mag. Judge Smith (May 7, 2011) (Dkt. No. 99).) In a May 20, 2011 letter to

this Court Plaintiff called Magistrate Judge Smith a "gangsta" and defense counsel "her fellas."

(Letter from Pl. to Ct. ("Pl.'s May 20 Letter") 3 (May 20, 2011).) Plaintiff also stated that

Magistrate Judge Smith was "representing evil at this time," and "by eliminating her evil we

[sic] going to be shifting universe to a better and peaceful place." (*Id.* at 4.) Plaintiff then asked

for this Court's help to "kill the evil." (*Id.*) Both letters indicate that they were sent via email to

defense counsel. In a June 2, 2011 letter to this Court, Plaintiff referred to defense counsel and

Magistrate Judge Smith as "capitalistic pigs," defined as "very egotistical, cold, emotionally

retarded human beings . . . who use other human beings in very sick way." (Letter from Pl. to

Ct. (June 2, 2011) (Dkt. No. 111).) In a June 4, 2011 letter, Plaintiff called defense counsel and

4

Magistrate Judge Smith "puppets," and said they "are like chicken [sic] running around without the head on their shoulders give me a dollar, give me a dollar I do anything for it." (Letter from Pl. to Ct. (June 4, 2011) (Dkt. No. 109).)

Plaintiff also has begun writing The Honorable Loretta A. Preska, the Chief Judge of this District, with wholly unsubstantiated allegations of corruption by Magistrate Judge Smith. In a June 5, 2011 letter, for example, Plaintiff claimed that she overheard in the courthouse that the individual Defendants in her case had "offered [Magistrate Judge] Smith through [defense counsel] $5000 in cash once she will dismiss [her] case." (Letter from Pl. to Chief Judge Preska (June 5, 2011); *see also* Letter from Pl. to Chief Judge Preska (June 6, 2011) ("[J]udge Smith is corrupt judge. . . . She is hurting good people, she is degrading her honorable position and she is polluting our planet with injustice. . . . [S]he is using her position to get extra cash so she twists the whole litigation direction to gain her extra money and it is all in cash.").)

### B. Deposition Transcripts

At the initial conference before Magistrate Judge Smith on October 15, 2009, Plaintiff indicated that she wished to conduct depositions of the individual Defendants, and was "expressly advised" by Magistrate Judge Smith that depositions were expensive. (Feb. 17 Order 6.) Plaintiff was encouraged to contact court reporting agencies to see what the cost of producing transcripts might be, and to consider the less expensive alternative of substantive interrogatories. (*Id.*) Plaintiff was again informed at a conference on May 7, 2010 that she could audio record the deposition rather than using a stenographer, but that she would still have to produce a certified transcript of the recording, which would be much more expensive than written interrogatories. (*Id.* at 13-14.) Plaintiff was reminded that "she had the inexpensive option of proceeding by written interrogatories rather than proceeding by deposition, but that she

5

would not be permitted to do both." (*Id.* at 14.)   The requirement that Plaintiff pay for the preparation of a certified transcript from the audio recording was again "discussed at length" at a conference on July 9, 2010. (*Id.*)

Despite these repeated warnings, on September 9, 2010 Plaintiff told Magistrate Judge Smith that she previously believed that she only had to obtain the CD of the deposition recording, and that she could then provide copies of the CD to defense counsel. (*Id.* at 18.) Magistrate Judge Smith (again) informed Plaintiff that this was incorrect, and (again) reminded Plaintiff that "she had been cautioned about the expense of proceeding by way of deposition." (*Id.*)   Defendants offered to discontinue the depositions of individual Defendants and proceed by written interrogatories, but Plaintiff responded that she would pay the cost of the transcripts. (*Id.* at 19.)   Three months later, Plaintiff wrote that she had sent payment to a court reporter to have the deposition transcripts prepared. (*Id.* at 27.)   Six days later, Plaintiff reversed course, and claimed that she had been under the impression that she could transcribe the transcripts herself from the CD recordings, or give the attorneys the CD "and they can use there [sic] own transcriber." (*Id.* at 28.)   Three weeks later, Plaintiff reiterated her position that she should not have to pay for deposition transcripts, but should be able to turn over the CD to counsel. (*Id.* at 29.)   Two weeks later, in a January 21, 2011 letter to Chief Judge Preska and Chief Magistrate Judge Yanthis, Plaintiff complained of the cost of providing transcripts, and asked for more time. (*Id.* at 30.)

In her February 17, 2011 Order, Magistrate Judge Smith instructed Plaintiff to produce a certified transcript of the depositions by March 17, 2011.  If Plaintiff did not meet this deadline, Magistrate Judge Smith warned Plaintiff that she would recommend that Plaintiff be precluded from using any of the transcripts, or the deposition testimony, of the individual Defendants. (*Id.*

at 43-44.) As of the April 28, 2011 R & R, Plaintiff had still not provided the transcripts, nor had she "even provided a copy of the audio recording to Defendants' counsel, more than six months after the depositions were conducted." (R & R 8.)   Magistrate Judge Smith therefore recommended that Plaintiff should "[a]t the very least" be prohibited from using Defendants' depositions for any purpose, and that Defendants should be allowed to "use affidavits in lieu of deposition transcripts with regard to any motions that may be filed in the matter." (*Id.* at 8-9.) Magistrate Judge Smith also recommended that Plaintiff's action be dismissed with prejudice.

Since the R & R, Plaintiff has continued to insist that she should not have to produce the transcripts. In a May 20, 2011 letter to this Court, Plaintiff claimed that she had sent defense counsel a "copy of [her] 7 CD set from [her] deposition of his defendants in December of 2010," and another copy in May 2011. (Pl.'s May 20 Letter 1.)  She also claimed that she "went into depositions with understanding that [she could] produce to counsels [sic] CD's from this deposition and [she wouldn't] have to immediately be responsible for producing transcripts." (*Id.* at 2.)  Plaintiff asked why she could not produce the transcripts "for example once we are certain we [sic] going to trial with this case," with defense counsel using the CDs in the interim. (*Id.*)  She also stated that she had "already spent about $300 for down payment for these transcripts so it will get processed eventually," and that she was being discriminated against "because of [her] financial status and inability to pay for expensive transcripts." (*Id.*)

### C. Medical Records

Plaintiff was informed at the initial conference before Magistrate Judge Smith on October 15, 2009 that because she was claiming post-traumatic stress disorder ("PTSD") and severe emotional damages, Defendants were entitled to see any records of her treatment by a psychologist or psychiatrist. (Feb. 17 Order 7.)  At some point before March 2010, Plaintiff sent

7

Defendants a signed authorization for her psychological records, but Plaintiff then orally instructed her psychologist not to release any records. (*Id.* at 9-10.) At a conference on March 5, 2010, Magistrate Judge Smith again explained to Plaintiff that in light of her PTSD claim, she would have to sign an authorization for the records, or give up her claim of severe emotional trauma. (*Id.* at 10.) Magistrate Judge Smith also issued a confidentiality order with regard to Plaintiff's medical health records, and explained it to Plaintiff. (*Id.* at 10; Order of Jan. 25, 2010 (Dkt. No. 22).) Plaintiff then "assured counsel and the Court that she would provide the necessary authorizations the following week." (Feb. 17 Order 10.)

On September 24, 2010, Defendants informed Magistrate Judge Smith that Plaintiff had again verbally instructed her providers not to release the records, and to disregard her newly signed authorizations. (*Id.* at 21.) In a January 21, 2011 letter to Chief Judge Preska and Chief Magistrate Judge Yanthis, Plaintiff stated: "I will not be providing any more psychot[h]erapy notes and summaries from my medical providers because I have a right based upon New York Federal law [sic] not to be making the [sic] public simply because as the law states those are not medical diagnosis and notes and summaries are considered assumptions." (*Id.* at 30.) In her February 17 Order, Magistrate Judge Smith instructed Plaintiff to provide signed authorizations for certified copies of her medical records by March 3, 2011. (*Id.* at 43.) Magistrate Judge Smith warned Plaintiff that if she did not comply, Magistrate Judge Smith would recommend that Plaintiff be precluded from seeking damages for any emotional distress beyond garden variety emotional distress. (*Id.* at 44.)

After the February 17 Order, Plaintiff continued to insist that her medical authorizations could not be used, in a February 21, 2011 letter, February 22, 2011 email, and March 12, 2011 email to defense counsel. (March 25 Order 5; R & R 3-4.) When Magistrate Judge Smith issued

8

the R & R, Plaintiff still had not provided the authorizations.  (R & R 6-7.)  Magistrate Judge Smith therefore recommended that "[a]t the very minimum" Plaintiff be precluded "from claiming emotional distress damages beyond damages resulting from garden variety emotional distress."  (*Id.* at 7.)  Additionally, Magistrate Judge Smith recommended "the more drastic sanction" of dismissal with prejudice, due to "this willful and continuous refusal of Plaintiff to comply with her discovery obligations, combined with other sanctionable conduct."  (*Id.*)

In a June 5, 2011 letter to Chief Judge Preska, Plaintiff claimed that Magistrate Judge Smith had taken away her "rights as a patient" and her "privacy rights of [her] medical records." (Letter from Pl. to Chief Judge Preska (June 5, 2011).)  In a June 6, 2011 letter to Chief Judge Preska, Plaintiff said that she had given defense counsel "almost 26 medical authorizations for same medical providers and till this date the issue is not done yet."  (Letter from Pl. to Chief Judge Preska (June 6, 2011).)  Plaintiff claimed in a later letter to this Court that defense counsel had obtained medical records from her psychiatrist in New York City "against my authorizations" and "illegally."  (Letter from Pl. to Ct. (Oct. 18, 2011).)

Plaintiff appealed Magistrate Judge Smith's February 17, 2011, March 25, 2011, and June 28, 2011[2] Orders to the Second Circuit.  (Dkt. Nos. 70, 83, 117.)  The Second Circuit dismissed all three appeals for lack of jurisdiction because "final orders have not been issued by the district court as contemplated by 28 U.S.C. § 1291," which states that courts of appeals have jurisdiction over appeals from final decisions of district courts.  (Dkt. No. 120.)

---

[2] The June 28, 2011 Order denied Plaintiff's request for further production by the Parties, including defense counsel's cell phone numbers.  (Order of June 28, 2011 (Dkt. No. 115).)

## II. Discussion

### A. Standard of Review

A district court reviewing a report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also Chatmon v. Mance*, No. 07-CV-9655, 2011 WL 5023243, at *3 (S.D.N.Y. Oct. 20, 2011) (citing *Donahue v. Global Home Loans & Fin., Inc.*, No. 05-CV-8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007)). Under 28 U.S.C. § 636(b)(1) and Fed. R. of Civ. P. 72(b), parties may submit objections to the magistrate judge's report and recommendation. The objections must be "specific" and "written," Fed. R. Civ. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition," *id.*; *see also* 28 U.S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Fed. R. Civ. P. 5(b)(2)(c)-(f), *see* Fed. R. Civ. P. 6(d), for a total of seventeen working days, *see* Fed R. Civ. P. 6(a)(2).

Where a party submits timely objections to a report and recommendation, as Petitioner has here, the district court reviews de novo the parts of the report and recommendation to which the party objected. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Chatmon*, 2011 WL 5023243, at *3. The district court "may adopt those portions of the . . . report [and recommendation] to which no specific written objection is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *Eisenberg v. New England Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226 (S.D.N.Y. 2008) (internal quotation marks omitted). Because Petitioner appears to object to the R & R in its entirety, the Court will review the Petition de novo.

10

### B. Inappropriate Communications

Plaintiff objects to Magistrate Judge Smith's recommendation that her case be dismissed due to her repeated "threats against counsel, and libelous allegations against counsel and the Court," and continued violations of the March 25 Order. (R & R 14.)

First, Plaintiff claims that the prohibition against communicating with the Court or defense counsel except by mail or fax is "entirely one discriminative order to scrutinize [her] ability to continue this case through Forma Pauperis Status and while in financial hardship." (Obj. to R & R ("Obj.") 2.) Plaintiff further claims that the Order does not protect her "privacy to the fullest" and is too costly, because she is "not comfortable to be faxing information because of the privacy and [she] prefer[s] serving over the internet and [she] do not hae [sic] free access to fax either." (*Id.* at 2-3.) This argument is unpersuasive: the March 25 Order was issued after multiple warnings to Plaintiff about her numerous inappropriate emails and phone calls to defense counsel. In addition, Plaintiff's financial condition was explicitly taken into account by Magistrate Judge Smith when she permitted Plaintiff to communicate not only by mail, but also by fax, with defense counsel. (March 25 Order 4 ("[Defendants], in their letter of March 14, agreed to modify their request to permit Plaintiff to communicate via facsimile with copies to the Court, based on Plaintiff's repeated claims of poverty, even if the Court grants their request to prohibit Plaintiff from email communication. Thus, the Court considers Plaintiff's financial condition in issuing this Order.").)

Second, Plaintiff claims that this prohibition violates Federal Rule of Civil Procedure 1 ("Rule 1"), which states that the Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Plaintiff says that the "Internet is the only one and last thing which served to proceed in this

11

litigation in [sic] fast inexpensive manner as number 1 Federal rule of Civil procedure require

[sic]." (Obj. 2.) Magistrate Judge Smith cited Rule 1 in her February 17 Order, noting that it

was Plaintiff who was delaying the trial:

> In an effort to give the *pro se* Plaintiff every opportunity to pursue discovery in
> her case, the Court has granted her extension upon extension. The Court has
> taken time to explain each step of the process to Plaintiff at the ten separate
> proceedings where she was present. As a result, this case, which should have had
> discovery complete in March, 2010, is still in the discovery phase. This process
> has been neither speedy nor inexpensive for Defendants, who have had to be
> represented by counsel at every proceeding, and who are prejudiced increasingly
> as the delays continue. While the process has also not been speedy or
> inexpensive for Plaintiff, she has the ability to conclude the proceedings, and it is
> her responsibility to do so.

(Feb. 17 Order 41.) For Plaintiff to claim that the March 25 Order violates Rule 1 by unduly

delaying litigation, given the numerous delays she has caused in this trial, is disingenuous.

As for Plaintiff's inappropriate and threatening language, Plaintiff states that

"[Magistrate Judge] Smith has full responsibility for [her] harsh language dealing with

counsels." (Obj. 3.) Plaintiff further states that she has PTSD, that "to have angry outrages is

very common symptom in PTSD patients," and that she has a "right to free hate speech as the

first amendment of the US constitution states." (*Id.*) This argument is singularly unpersuasive.

Pro se plaintiffs (including those with PTSD) are "entitled to some latitude generally, but [they

are] not entitled to any latitude when it comes to threatening and inappropriate conduct."

*Cameron v. Lambert*, No. 07-CV-9258, 2008 WL 4823596, at *4 (S.D.N.Y. Nov. 7, 2008)

(dismissing pro se plaintiff's complaint with prejudice because of plaintiff's threatening

conduct); *see also Nelson v. Eaves*, 140 F. Supp. 2d 319, 322-23 (S.D.N.Y. 2001) (dismissing

complaint with prejudice where pro se plaintiff wrote ten "abusive, demeaning, and threatening"

letters over the course of two months to opposing counsel, which "reveal[ed] malice and an

intent to harass"). Plaintiff's threatening and inappropriate language has surfaced not in spur-of-the-moment comments in conferences, but in letters and other written communication that presumably involve some thought and care in their preparation. Indeed, Plaintiff has continued to send threatening and inappropriate communications to opposing counsel and Magistrate Judge Smith, despite numerous warnings from Magistrate Judge Smith. This Court, and frankly no court, should or will tolerate such behavior.

The Court is willing to let Plaintiff atone for her misbehavior, but Plaintiff should know that if there is one more instance of threatening or inappropriate communication, the case will be dismissed with prejudice. *See Cameron*, 2008 WL 4823596, at *4 (Courts "may impose sanctions against a party for act[ing] in bad faith, vexatiously, wantonly, or for oppressive reasons . . . and for misconduct during the course of litigation." (alteration in the original) (citation and internal quotation marks omitted)). "The sanction of dismissal is a drastic remedy that should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007) (internal quotation marks omitted). However, "[d]ismissal of a pro se litigant's action may be appropriate so long as a warning has been given that non-compliance can result in dismissal." *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (affirming district court's sanction of dismissal, where plaintiff demonstrated "sustained and willful intransigence in the face of repeated and explicit warnings from the court that the refusal to comply with court orders . . . would result in the dismissal of [the] action").

### C. Deposition Transcripts

Plaintiff's in forma pauperis status does not excuse her from producing a certified transcript of her depositions of Defendants, which is the ordinary practice in this court. *See Bey*

13

*v. City of New York*, No. 99-CV-3873, 2010 WL 3910231, at *5 (S.D.N.Y. Sept. 21, 2010)

(noting that "parties are generally responsible for their own costs, and their adversaries are not

obligated to finance their litigation"); *Espinal v. Coughlin*, No. 98-CV-2579, 1999 WL 1063186,

at *2 (S.D.N.Y. Nov. 23, 1999) ("[T]here would be no basis to grant Plaintiff's implied request

that the court pay for Plaintiff's deposition costs.  There is no authority that requires the federal

government to pay for the discovery expenses of a pro se plaintiff in a civil case. . . . The in

forma pauperis statute, 28 U.S.C. § 1915, permits the waiver of prepayment of fees and costs for

in forma pauperis litigants, but there is no provision in the statute for the payment by the

government of the costs of deposition transcripts." (citation and internal quotation marks

omitted)); *Doe v. United States*, 112 F.R.D. 183, 184-85 (S.D.N.Y. 1986) ("[A] defendant is not

required to advance a plaintiff's stenographic and transcription deposition expenses merely

because a plaintiff is unable to pay for such expenses. . . . Nor does the in forma pauperis statute,

28 U.S.C. § 1915, require the Government to advance funds for deposition expenses.").

        Federal Rule of Civil Procedure 30(b)(3)(A) permits a party to record a deposition by

audiotape only, but the advisory notes clarify that any such party "should understand that a

transcript will be required by Rule 26(a)(3)(B) and Rule 32(c) if the deposition is later to be

offered as evidence at trial or on a dispositive motion under Rule 56." Fed. R. Civ. P. 30

advisory committee's note (1993 Amendments).  In light of this Rule, another court in this

District ordered the production of transcripts of depositions "soon after the deposition."  *ACLI*

*Gov't Sec., Inc. v. Rhoades*, No. 81-CV-2555, 1991 WL 270450, at *3-4 (S.D.N.Y. Dec. 5, 1991)

("[F]airness ordinarily demands that a transcript be provided the deponent free of charge for

review soon after the deposition."); *see also Hudson v. Spellman High Voltage*, 178 F.R.D. 29,

31 (E.D.N.Y. 1998) (ordering plaintiff to provide transcripts of any of the tape-recorded

14

depositions to be used at trial "within forty-five (45) days from the completion of discovery").

Plaintiff does not object to the requirement to produce transcripts in her May 15, 2011 Objection to the R & R, but instead states that the transcripts are "almost ready to be processed and mailed out to defense." (Obj. 2.) In the interest of completeness, however, the Court will address Plaintiff's objections to producing transcripts from her subsequent May 20, 2011 letter to the Court. (Pl.'s May 20 Letter.) In this letter, Plaintiff claims that she "went into depositions with the understanding" that she could produce the CDs to counsel and did not have to produce transcripts until "we are certain we going to trial with this case." (*Id.* at 2.) This assertion is conclusively contradicted by the record, as Magistrate Judge Smith repeatedly instructed Plaintiff that she would have to pay for certified transcripts of the depositions. (Feb. 17 Order 6, 13-14, 16, 18-20, 22, 23-24.) Plaintiff's production of the CDs is irrelevant,[3] as she was repeatedly instructed that even if the depositions were audio recorded, she would still have to produce a certified transcript. (*Id.* at 14, 16, 18.) Plaintiff knew that transcripts would have to be produced in a "reasonably timely fashion," as Plaintiff was instructed by Magistrate Judge Smith to produce transcripts within thirty days at the September 24, 2010 conference, and Plaintiff in fact informed Magistrate Judge Smith at that time that she had already ordered the transcripts to be completed within thirty days. (*Id.* at 22.)

Also, Plaintiff's claim that she is being discriminated against "because of [her] financial status and inability to pay for expensive transcripts," (Pl.'s May 20 Letter 2), is similarly disingenuous. Plaintiff was repeatedly informed that she could proceed by the less expensive

---

[3] In her Objection to the R & R, Plaintiff stated that she sent defense counsel a "7 CD set from [the] deposition." (Obj. 2.) For the purpose of this Order, the Court assumes that this is true, but it does not change the analysis.

method of interrogatories, (Feb. 17 Order 6, 14), and given extensions on transcript production, based on her financial situation, (*id.* at 19-20, 23-24).

The failure to produce deposition transcripts has been ongoing for over a year, since the depositions were conducted in September 2010. (*Id.* at 40.) Plaintiff was warned nine months ago in the February 17 Order that if she did not produce the transcripts in thirty days, Magistrate Judge Smith would recommend that she be precluded from using the deposition testimony in any way. (*Id.* at 43-44.) Plaintiff has been given ample time to produce the transcripts, and indeed stated on May 15, 2011 that the transcripts were almost ready to be processed and mailed to Defendants. (Obj. 2 ("Transcipts [sic] are almost ready to be processed and mailed out to defense. Deposit for transcipts [sic] was paid and Ms. Staten/court reporter/ of Federal White Plains courthouse is almost done with them.").) Plaintiff is given thirty days to produce the transcripts, or else she will be barred from using them during motion practice or at trial. *See Ulyanenko v. Metro. Life Ins. Co.*, 275 F.R.D. 179, 185 (S.D.N.Y. 2011) (ordering production of deposition transcript within ten days of entry of order); *Llewellyn v. N. Am. Trading*, No. 93-CV-8894, 1997 WL 177878, at *7 (S.D.N.Y. Apr. 11, 1997) (ordering production of deposition transcript within ten days of order); *United States v. Davis*, 131 F.R.D. 391, 408 (S.D.N.Y.1990) (ordering production of interview transcript "within 20 days of the date of this Order").

### D. Medical Records

Plaintiff says there is no law requiring her to release "personal notes, summaries, observation and psychotherapy notes . . . just because [she is] claiming emotional injury as part of [her] claim." (Obj. 1.) Plaintiff also argues that she should release this information only to her own attorney (though she does not have one), not defense counsel. (*Id.* at 2.) Plaintiff then suggests that if defense counsel want this information, they can depose the mental health

16

provider "instead of release of this information entirely." (*Id.*)

These objections lack merit. "It is well settled that a party waives [her] doctor-patient privilege when [she] puts [her] medical condition into issue." *Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc.*, 132 F. Supp. 2d 215, 220 (S.D.N.Y. 2001); *see also In re Sims*, 534 F.3d 117, 134 (2d Cir. 2008) (holding that "a plaintiff may withdraw or formally abandon all claims for emotional distress in order to avoid forfeiting [her] psychotherapist-patient privilege"); *Bowen v. FedEx Corp.*, No. 05-CV-7487, 2007 WL 646293, at *3 (S.D.N.Y. Feb. 28, 2007) ("In any lawsuit where the plaintiff is alleging physical and emotional injuries, it is standard procedure for the judge to direct the plaintiff to sign a HIPPA-compliant [sic] authorization for the release of his complete medical, pharmacy, psychiatric or psychological treatment or counseling records." (internal quotation marks omitted)); *Murray v. Bd. of Educ. of N.Y.*, 199 F.R.D. 154, 156 (S.D.N.Y. 2001) ("Plaintiff put her mental condition in issue when she claimed damages for emotional distress in this action and therefore waived the psychiatrist-patient privilege for the psychiatrist's notes that are relevant to the time and subject matter of this action." (internal quotation marks omitted)). A waiver is required "in the interests of fairness," so that a party cannot "use the privilege both as a shield and a sword." *Sims*, 534 F.3d at 132 (internal quotation marks omitted). "In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party." *Id.* (emphasis and internal quotation marks omitted). If a plaintiff wants to avoid "forfeiting [her] psychotherapist-patient privilege," the Second Circuit has held that she "may withdraw or formally abandon all claims for emotional distress." *Id.* at 134. In other words, Plaintiff may continue to protect the privacy of her mental health records, but only at the expense of her

17

mental health claims that go beyond garden variety emotional distress.[4]

In the alternative, Plaintiff states that Magistrate Judge Smith did not give her time to object to the release of these records, as required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). (Obj. 1.) Presumably, Plaintiff is referencing HIPAA regulation 45 C.F.R. § 164.512(e), which covers disclosures of medical records for judicial proceedings. The regulation provides that a health provider can disclose protected health records in response to a discovery request, even without a protective order signed by the patient, if it receives "satisfactory assurance" that reasonable efforts have been made to give the patient notice of the request. 45 C.F.R. § 164.512(e)(1)(ii)(A); see also Caines v. Addiction Research & Treatment Corp., No. 06-CV-3399, 2007 WL 895140, at *1 (S.D.N.Y. Mar. 20, 2007) ("The pertinent regulations issued under [HIPAA] explicitly provide that documents containing protected health information are to be produced . . . in response to a discovery request without a court order if the patient has been given notice or the discovering party has made reasonable efforts to obtain 'a qualified protective order.'" (quoting 45 C.F.R. § 164.512(e)(1)(ii)(A)-(B))). "Satisfactory assurance" includes proof that the patient has been given time to object to the court. 45 C.F.R. § 164.512(e)(1)(iii)(C). This provision is inapplicable here, where Defendants are not seeking the records without Plaintiff's permission. Rather, Plaintiff has been given the choice of either providing HIPAA-compliant authorizations to Defendants, or abandoning her

---

[4] To be clear, Plaintiff may continue with any garden variety emotional damage claims, even if she does not provide her medical records. See Sims, 534 F.3d at 142 (plaintiff withdrew "any claim to damages for mental injury or any non-garden-variety emotional injury," and was not required to disclose his mental health records); In re Consol. RNC Cases, 2009 WL 130178, at *13 (S.D.N.Y. Jan. 8, 2009) ("Plaintiffs' tort claims of non-garden variety emotional distress are dismissed. However, as noted above, Plaintiffs' garden variety damages claims for emotional distress relating to the incidents in question may proceed at trial . . . .").

claim to non-garden variety emotional health damages.

Plaintiff has been given ample time to comply with Magistrate Judge Smith's orders to make her medical records available. Indeed, Plaintiff has been on notice since October 29, 2009 that her claim of severe emotional distress entitled Defendants to see her mental health records. (Feb. 17 Order 7.) Plaintiff was warned in the February 17 Order that if she did not produce signed authorizations by March 3, 2011, Magistrate Judge Smith would recommend that she be precluded from seeking damages for any emotional distress beyond garden variety emotional distress. (Feb. 17 Order 43-44.) Plaintiff still has not signed the authorizations for release of these records, and insists that she will not do so. In light of this, Plaintiff is barred from seeking damages for any emotional injury, beyond garden variety emotional distress.

### III. Conclusion

For the reasons discussed above, the R & R is adopted in part. Plaintiff has thirty days to provide Defendants with certified transcripts of Defendants' depositions, or Plaintiff will be barred from using the transcripts or deposition testimony of the individual Defendants. Plaintiff also is barred from seeking damages for any emotional injury, beyond garden variety emotional distress.

Regarding Plaintiff's conduct toward counsel, and, in particular, toward Magistrate Judge Smith, it should be clear to Plaintiff that there is no justification for her abusive, threatening, and insulting communications. While Plaintiff is entitled to represent herself in this or any lawsuit, she must understand the difference between advocacy, which always is encouraged and tolerated, and personal insults, which are not. Counsel for Defendants have done nothing to deserve Plaintiff's personal attacks, and there is no cause whatsoever for Plaintiff's disrespectful and abusive behavior directed at Magistrate Judge Smith. Indeed, Magistrate Judge Smith has

19

been a model of patience and professionalism throughout this case.  Accordingly, if Plaintiff

disobeys Magistrate Judge Smith's orders of February 17, 2011, and March 25, 2011, again, and

communicates with the Court or opposing counsel in an inappropriate or threatening manner, the

case will be dismissed with prejudice.

       The Court will keep this case for all purposes from here forward, and will conduct a

status conference on February 3, 2012, at 2:00 pm.

SO ORDERED.


Dated:          December 22, 2011
                White Plains, New York

                                                    KENNETH M. KARAS
                                                    UNITED STATES DISTRICT JUDGE


20